**UNITED STATES DISTRICT COURT**
**IN THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| Ross Dress for Less, Inc., | ) | C/A No.: 0:10-703-CMC |
| Plaintiff, | ) | |
| | ) | **OPINION AND ORDER** |
| v. | ) | |
| | ) | |
| Lauth Construction Group, LLC, Earnhardt Grading, Inc., and MacTec Engineering & Consulting, Inc. | ) | |
| Defendants. | ) | |
| | ) | |
| Earnhardt Grading, Inc., | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| MW Clearing and Grading, Inc., | ) | |
| Third-Party Defendant. | ) | |
| | ) | |
| Lauth Construction Group, LLC, | ) | |
| Third-Party Plaintiffs, | ) | |
| v. | ) | |
| Fidelity and Deposit Company of Maryland, | ) | |
| Third-Party Defendant. | ) | |

The court held a hearing on all pending motions in this action on April 4, 2012. *See* Dkt. No. 195. This order addresses three outstanding issues on which the court deferred ruling. After supplemental briefing, the court now denies the motion of Defendants Lauth Construction Group,

LLC ("Lauth") and Earnhardt Grading, Inc. ("Earnhardt") to exclude structural repair damages claimed by Plaintiff Ross Dress for Less, Inc. ("Ross") (Dkt. No. 119). The court grants Lauth and Earnhardt's motion for summary judgment as to Ross's negligence and gross negligence claims (Dkt. No. 117), and grants MacTec's motion for summary judgment as to Ross's negligence and gross negligence claims (Dkt. No. 121).

## BACKGROUND

In 2008, Plaintiff Ross Dress for Less purchased property ("Property") from Transpointe I, LLC and KTR Transpointe, LLC (collectively "Transpointe"). Located in Rock Hill, South Carolina, the Property consists of a 423,000 square foot warehouse ("SEDC3") on 29.4 acres and a vacant parcel of 37.4 acres ("Vacant Parcel"). This action arises out of certain alleged failures associated with the construction of SEDC3 and certain work performed on the Vacant Parcel ("Project") prior to Plaintiff's purchase.

**Master Contract.** After purchasing the Property in 2000, Transpointe sought to develop the Property as a commercial warehouse and hired Lauth as the general contractor on the Project. As a result, on May 9, 2005, Transpointe and Lauth entered into two contracts. Dkt. Nos. 143-5, 143-6. The first contract was for "Phase One" of the Project, which involved the construction of a 423,000 square foot warehouse (excluding interior work) and surrounding paving and sidewalks. The guaranteed maximum price of the contract for Phase One was $9,406,840. Dkt. No. 143-5 at 1. As part of Phase One, Lauth was required to "provide soils, concrete, asphalt, and steel testing to insure that materials meet specifications and are installed in accordance with specifications. All copies of reports will be forwarded to Transpointe I LLC." Dkt. No. 143-5 at 14. The second contract was for "Phase Two" of the Project and involved construction of the infrastructure, including, *inter alia*,

mass grading, an erosion control system, a stormwater management plan, landscaping, and utility, waterline and sewer plans. Dkt. No. 143-6 at 13. The guaranteed maximum price for the contract for Phase Two was $1,326,555. *Id.* at 1. The court refers to Phase One and Phase Two contracts collectively as the "Master Contract."

In addition to the terms specific to each phase, AIA Document A201-1997[1] was attached as the "General Conditions" to the Master Contract. Relevant to this case, the Master Contract contains the following warranty:

§ 3.5 WARRANTY
§ 3.5.1 The contractor [Lauth] warrants to the Owner [Transpointe] that materials and equipment furnished under the Contract will be new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved, may be considered nonconforming. The Contractor's warranty excludes remedy for damage or defect caused by Owner's abuse, modifications not executed by the Contractor, improper or insufficient maintenance by Owner, improper operation by Owner, or normal wear and tear and normal usage. If required by the Owner or the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

Dkt. No. 143-5 at 39. Further, the contract explains that subcontractors (and sub-subcontractors) of Lauth are bound by the terms of the Master Contract:

§5.3 SUBCONTRACTUAL RELATIONS
§5.3.1 By appropriate agreement, written where legally required for validity, *the Contractor shall require each Subcontractor*, to the extent of the Work to be performed by the Subcontractor, *to be bound to the Contractor by the terms of the Contract Documents,* and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work,

---

[1] Exhibit F contains a disclaimer that the AIA document has been edited and that "An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed." Dkt. No. 143-5 at 26. No *Additions and Deletions Report* has been provided to the court.

which the Contractor, by these Documents, assumes toward the Owner and to perform the Work in accordance with the requirements of the Contract Documents. Each subcontract agreement shall preserve and protect the rights of the Owner under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights . . . Where appropriate, the Contractor shall require each Subcontractor to enter unto similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor copies of the Contract Documents to which the Subcontractor will be bound. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

Dkt. No. 143.5 at 47-48, §5.3.1 (emphasis added).

The Master Contract states that "[t]he Owner and Contractor respectively bind themselves . . . [and] assigns . . . in respect to covenants, agreements and obligations contained in the Contract Documents." Dkt. No. 143-5 at 62, § 13.2.1. The Master Contract provides that it is governed by the law of the state where the Project is located. Dkt. No. 143-5 at 62, § 13.1.1. The court finds that the Project is located in Fort Mill, South Carolina and that the Master Contract is thus governed by South Carolina law.

**MacTec's Contract.** On May 25, 2005, Lauth entered into a subcontract with MacTec for certain geotechnical and engineering services on the Project ("MacTec's Contract"). The contract incorporated MacTec's proposal to Lauth for the Transpointe Building in Fort Mill, South Carolina (MACTEC Proposal No. PROP-05-CHLT-0238), in which MacTec offered, *inter alia*, to "[o]bserve the site after topsoil has been stripped . . . to verify that any objectionable soils and materials have been removed," perform certain tests on "representative fill soils in accordance with ASTM and per project plans and specifications," and "[r]eport soil inspection and testing activities to the appropriate project representatives and contractor on a daily basis and provide test results in a written report." Dkt. No. 121-2 at 2. The cost estimate for the proposal was $90,000. Dkt. No. 121-2 at 7.

4

The contract contains an express warranty and a disclaimer of all other express and implied warranties:

> 1. STANDARD OF CARE.  MACTEC will perform the Scope of Authorized Services set forth below[2] and in any subsequent change order ("Services") as an independent contractor, using that degree of skill and care ordinarily exercised under similar conditions by reputable members of MACTEC's profession practicing in the same or similar locality at the time of performance.  NO OTHER WARRANTY, EXPRESS OR IMPLIED, IS MADE OR INTENDED, AND THE SAME ARE SPECIFICALLY DISCLAIMED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  Any claim that Client [Lauth] may bring against MACTEC with respect to the Services to be performed by MACTEC must be commenced with one (1) year after the date on which Client first knew or should have known of the deficient Services upon which the claim is based.

Dkt. No. 121-2 at 8, ¶ 1. The court has not been provided with evidence that MacTec received a copy of the General Conditions of the Master Contract or that MacTec specifically agreed to be bound by the Master Contract, and the parties have confirmed that there is no written documentation that MacTec agreed to be bound by the Master Contract.

MacTec's Contract also contains the following provision on the ownership of MacTec's "deliverables":

> All reports, drawings, plans, designs and other documents prepared by MACTEC, which MACTEC's Proposal or the below Scope of Authorized Services specify are to be delivered to Client (collectively, "Deliverables") . . . remain the property of MACTEC.

> Client agrees that the Deliverables (i) are intended for the exclusive use and benefit of, and may be relied upon only by, Client and (ii) will not be used at a Site or for a Project not expressly provided for in the Agreement. . . . Client agrees that any prospective lender, buyer, seller or other third party who wishes to rely on any Deliverables must first sign MACTEC's Secondary Client Agreement.  Client will

---

[2]  The Scope of Authorized Services is later defined as "MACTEC Proposal Number PROP05CHLT0238 dated May 27, 2005, which is attached hereto and incorporated herein by reference."  Dkt. No. 121-2 at 10.

defend, indemnify and hold harmless MACTEC, its parent, subsidiaries, affiliates and subcontractors . . . (collectively, "Indemnitees") from and against all claims, settlements, costs, expenses, liabilities, damages, penalties and interest, including attorneys' fees and litigation expenses, (collectively, "Liabilities") asserted against or incurred by indemnitees as a result of any unauthorized use of, or reliance on, the Deliverables. . . .

Dkt. No. 121-4 at 9, ¶ 4.  MacTec's Contract provides that it is governed by the law of Georgia.

**Earnhardt's Contract.**  On June 16, 2005, Lauth entered into a subcontract with Earnhardt for "all work necessary for the completion of Site Clearing, Erosion Control, Mass Earthwork, Storm Drainage Systems, Sanitary Sewer, and Water Services as required" for the Project ("Earnhardt's Contract").[3]  Dkt. No. 143-7 at 7.  The contract amount was $2,301,191.00.  *Id.* at 2.  Earnhardt's contract specified that all work would be furnished "in accordance with the General Conditions of the Contract between Owner [Transpointe] and Contractor [Lauth]."  *Id.* at 2, ¶ 1.  Further, "Subcontractor agrees to be bound to Contractor by all the terms of the agreement between Contractor and Owner and by the Contract Documents, and to assume toward Contractor all of the obligations and the responsibilities that Contractor by those instruments assumed toward Owner."

---

[3]  Section 1 of Attachment A explains the services included for "Site Clearing, Erosion Control, and Earthwork:"

> The scope of work shall include all required engineering and layout; site clearing and grubbing; slope protection and erosion control; topsoil stripping; stockpile; replacement of the topsoil in all lawn and planting areas on the site; all necessary bulk earthwork cut and compacted fills; all necessary drying and/or wetting of the compacted fill materials required to enable the fill material to meet the specified compaction density; final grading of the building pad, pavements, parking lots, roadways, and lawn/planting areas; provide and place 4" of compacted ABC stone on the building pad, backfilling of curb and gutter areas; all necessary dewatering and/or temporary drainage work required for the complete execution of all earthwork. . . .

Dkt. No. 143-7 at 7.

*Id.* at 5, ¶ 28. Earnhardt's contract also contains the following warranty:

> 25. Subcontractor [Earnhardt] shall warrant that all work performed and/or materials supplied be of good quality, free of improper workmanship and in conformance with the Contract Documents for one year after final completion or installation of materials or longer as may be required herewith.

*Id.* at ¶ 25. Earnhardt's Contract provides that it is governed by the law of North Carolina. *Id.* at 6, ¶ 33.

**MW Clearing's Contract.** Earnhardt subcontracted certain work to MW Clearing. Although there is some dispute as to the scope of MW Clearing's work, MW Clearing's superintendent and foreman testified that MW Clearing was involved in the initial site clearing and grubbing and disposal of the trees on the Property. Dkt. No. 120-1 at 6. MW Clearing also admits that it did some initial grading work on Basins 2 and 4. MW Clearing claims it was paid $223,072.50 for its work on the Project. Dkt. No. 120-2 at 23 (Patrick Moorehead Dep.). The court has not been provided with any written contract between Earnhardt and MW Clearing.

**End of Construction.** Construction was completed in August 2006. As part of the construction, four detention ponds were built to control sediment runoff during construction. At the end of construction, three of the ponds were converted into storm water basins (Basins 1, 2, and 4) and one pond was abandoned (Basin 3). In August 2007, Transpointe leased the warehouse, SEDC3, to Ross.

**Ross Purchases Property.** On March 28, 2008, Transpointe and Ross entered into an agreement of purchase and sale of the Property "as-is" for $18,750,000. Dkt. No. 140-1. In connection with the sale, Transpointe, as Seller, was obligated to provide to Ross "[r]eports prepared by third parties for the benefit of Seller with respect to soils, geology, archaeology, Hazardous

7

Substances . . . ." Dkt. No. 140-1 at 11. At closing, Transpointe assigned "Intangible Property" to Ross, which includes "all of the Seller's right, title and interest in any and all assignable warranties and guaranties relating to the Property, including all warranties from the general contractor and, to the extent enforceable by Seller, all subcontractors performing any portion of the construction work on the Realty and all suppliers or materialmen supplying any materials for such construction work." Dkt. No. 140-1 at 3.

**Alleged Defect Discovered.** In March 2009, Basin 4 failed and caused water and debris to flow onto Interstate 77. As a result of the investigation following the failure of Basin 4, Plaintiff alleges it discovered that the soil underneath SEDC3 and the surrounding property is composed of unsuitable organic material, such as roots, stumps, and burnt wood. According to Plaintiff, this organic material should have been removed from the property prior to construction and not buried as fill material. Plaintiff further alleges that organic material releases methane gas and creates voids in the soil as it decomposes, which can cause settlement and compromise the integrity of buildings.

Plaintiff initiated this action by filing a Complaint on March 18, 2010. Dkt. No. 1. Plaintiff filed a Second Amended Complaint on March 4, 2011. Dkt. No. 63. The Second Amended Complaint asserts claims for breach of warranty, negligence, gross negligence, private action for public nuisance, and private nuisance against three parties allegedly responsible for a defect in the soil on the Property: the general contractor (Lauth Construction Group, LLC), Lauth's subcontractor that graded some or all of the Property (Earnhardt Grading, Inc.), and Lauth's subcontractor that served as a geotechnical engineer on the project (MacTec Engineering and Consulting, Inc.). Earnhardt filed a third-party claim against its subcontractor MW Clearing & Grading, Inc. alleging that MW Clearing did certain work on the Property, including but not limited to the construction of Basins 2 and 4. Dkt. No. 24. To the extent that Earnhardt is liable for the alleged failure of Basins

8

2 and 4, Earnhardt seeks legal and equitable indemnification from MW Clearing. Lauth filed a third-party claim against Fidelity and Deposit Company of Maryland based on a sub-contract Performance Bond (the "Bond") issued by Fidelity to Earnhardt. Dkt. No. 44. The Bond provides that, in the event Earnhardt fails to perform under its contract with Lauth, Fidelity will assume certain obligations. Lauth filed a cross-claim against Earnhardt (Dkt. No. 65), MacTec filed a cross-claim against Lauth for contractual indemnification (Dkt. No. 79), and Lauth filed a cross-claim against MacTec for equitable and/or contractual indemnification (Dkt. No. 82).

## I. Defendants Lauth and Earnhardt's Motion to Exclude Structural Repair Damages (Dkt. No. 119)

Plaintiff seeks damages to repair SEDC3 and its floor slab in anticipation of soil settlement due to the presence of organic material in the soil. Plaintiff proposes to offer expert testimony of Timothy Cook, a structural engineer, to explain his proposed designs to repair the floor of SEDC3, but Plaintiff failed to designate Cook as an expert.[4] Lauth and Earnhardt filed a motion to exclude Cook as an expert witness and to exclude structural repair damages based on Plaintiff's failure to offer expert testimony from a structural engineer. Dkt. No. 119. In response, Plaintiff represented to the court that it will not offer Cook as an expert witness, and that if he testifies, he will provide only lay testimony. On April 4, 2012, the court found Defendants' motion to exclude Cook as an expert witness moot based on Plaintiff's representation. Dkt. No. 195 at 2. The court also requested supplemental briefing as to how Plaintiff can prove structural repair damages without the expert testimony of Timothy Cook or other structural engineer. Lauth and Earnhardt filed a supplemental brief on this issue on May 21, 2012 (Dkt. No. 203), to which Plaintiff responded on June 8, 2012

---

[4] Plaintiff has admitted that "[t]he omission of Mr. Cook from the list of experts identified by Ross, [sic] was an oversight." Dkt. No. 206 at 4.

(Dkt. No. 206).  On June 25, 2012, Lauth and Earnhardt filed a reply.  Dkt. No. 211.

Although Plaintiff hired structural engineer Timothy Cook to design the underpinning system, Plaintiff has not identified a structural engineer as an expert witness to testify as to the design.[5]  Lauth and Earnhardt argue that a structural engineer is necessary to provide expert testimony as to "the purpose of the repair drawings related to the floor of SEDC #3, the preparation of the design schematics, the reason why the repairs are needed, why the fix recommended is the appropriate action, and the cost of the repairs."  Dkt. No. 119-1 at 15.  Plaintiff responds that "the decision as to what is necessary to avoid the future settlement of the building was made by Karl Suter of PSI."  Dkt. No. 206 at 2.  Plaintiff's expert Karl Suter, a geotechnical engineer, has opined:

> In order to remediate the existing SEDC-3 structure for the anticipated long-term settlement related to the decomposition of the organic matter, we envision an underpinning system extending through the fill to bear on dense residual soils or possibly weathered rock in order to provide long-term support of the existing column foundations and continuous wall building foundations.  Conceptually, the underpinning system could consist of either helical piers or micropiles. . . .
>
> The exact spacing and placement of the underpins (either helical piers or micropiles) would be determined by a licensed Structural Engineer and would depend upon the structural loads of the structure and design capacity of the foundation elements. . . .
>
> ******
>
> In conclusion, PSI believes the best remediation alternative to restore the facility to its original functionality is to support the continuous wall and column foundations and slab-on-grade with an underpin system.  Although we anticipate micropiles will be a more expensive remedial alternative when compared to helical piers, it may be

---

[5] On page three of its brief in response to Lauth and Earnhardt's supplemental brief, Plaintiff acknowledges that it has previously represented to the court that it will not offer Cook as an expert witness, and that if he testifies, he will provide lay testimony.  Dkt. No. 206 at 3.  One page later, Plaintiff states that "if the Court concludes that Mr. Cook should not be allowed to testify as an expert, the ruling is not fatal to Ross's case."  *Id.* at 4.  To the extent Plaintiff seeks to call Cook as an expert witness, that request is denied.  Cook is excluded from providing any expert testimony because Plaintiff failed to identify Cook as an expert witness and failed to produce an expert report from Cook.

prudent to choose micropiles to avoid the potential that the helical piers will not be able to penetrate through the organic matter layers to achieve depths required to develop minimum design capacities thus resulting in additional time delays and costs associated with the design and installation of two different foundation systems.

Dkt. No. 143-13 at 60-62 (Suter report at 10-12). Plaintiff argues that, based on Suter's opinion, "the only expert testimony Cook could provide is his analysis of the spacing and placement of the helical piers" and that "[t]he disputed issue is not the spacing of the helical piers, but whether any action need be taken at all to avoid settling."[6] Dkt. No. 206 at 3.

Suter opines that there will likely be long-term settlement and that "[i]t is very likely the stress on the structure from settlement will necessitate repair during its remaining useful design life." Suter report at 9. Suter also opines that there are several remediation options but ultimately recommends an underpinning system of micropiles to support the continuous wall and column foundations and the slab-on-grade. *Id.* at 12. Suter recommends that this work be completed without delay as the project would cost more if completed on an as-needed basis and may not be feasible "if the settlement of the structure gets too large prior to the remediation program." *Id.* The court finds that Suter's testimony,[7] without the expert testimony of Cook or another structural engineer, is evidence of the necessity of the structural repairs and a reasonable repair to prevent future structural failures to

---

[6] Plaintiff discusses helical piers in its supplemental brief, not micropiles as recommended by Suter. Suter report at 12. Cook also testified that the remedial plan chosen was a system of helical piers. Cook Dep. at 66-67. It is unclear based on the information before the court whether the "pricing information" on Cook's design is based on a system with helical piers or micropiles. In reviewing Cook's deposition, the court also observes that Cook stated that a structural engineer would be the type of engineer that would calculate the degree of tolerable settlement of SEDC3. Cook Dep. at 59-60. Suter's report does not provide the degree of tolerable settlement of SEDC3, but rather cites "the typical tolerable threshold values of 1-inch and 1/2-inch of differential settlement for structures." Suter report at 9.

[7] The court reminds Plaintiff that it has previously limited Suter's testimony to his opinions contained in his reports and depositions. *See* Dkt. No. 195 at 3.

SEDC3 based on the anticipated soil settlement. Suter has an opinion as to the potential for settlement, the need to repair the structure based on the soil's condition, and the recommended repair. He did not design the repair and the court is unaware of any opinion he has about Cook's designs or the cost of implementing Cook's designs.

Plaintiff argues that Patrick Winters, an architectural engineer employed at H&M Architects/Engineer, Inc., will be able to establish the cost of the structural repairs. Plaintiff explains that Cook was responsible for soliciting cost estimates from contractors for the "structural fix." Dkt. No. 206 at 3. Cook then provided the estimates to Patrick Winters, who has been designated as an expert witness by Plaintiff.[8] Plaintiff plans to have Winters testify as to the cost of the structural repairs, presumably those repairs as recommended by Suter in his report.[9] Plaintiff argues that it can meet its burden of proving structural repair damages through Suter and Winters, without the need for any expert testimony by Cook. *Id.* at 4 (arguing that, although the price quotes obtained by Cook may not be admitted as hearsay, they may be relied on by Winters in determining a total price for the structural repairs under Rule 703).

Winters *may* be able to fill in the gaps as to the reasonable costs to implement Suter's

---

[8] Plaintiff failed to provide Defendants a 26(a)(2) report for Patrick Winters. The court directed Plaintiff to provide Defendants a proper report for Winters by April 14, 2012. Defendants have not filed a motion in limine to exclude Winters' testimony after April 14, 2012. The court, therefore, assumes that such a report was timely provided to Defendants.

[9] The court previously denied Plaintiff's motion to determine admissibility of evidence, which requested that the court approve the admissibility of cost estimates through persons requesting estimates (such as a general contractor) rather than those providing estimates (such as a subcontractor). Dkt. No. 195 at 3. The court denied Plaintiff's motion because it did not have enough information about the contents of the estimates, and the process in which the estimates were solicited. Further, Plaintiff offered no theory as to why this hearsay evidence was admissible. Should Plaintiff seek to offer hearsay evidence of cost estimates at trial, the court will address any objections at that time.

recommended repairs.  Plaintiff proposes to use Winters to admit the cost estimates of implementing

Cook's design under Rule 703.  Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been
> made aware of or personally observed. If experts in the particular field would
> reasonably rely on those kinds of facts or data in forming an opinion on the subject,
> they need not be admissible for the opinion to be admitted.  But if the facts or data
> would otherwise be inadmissible, the proponent of the opinion may disclose them to
> the jury only if their probative value in helping the jury evaluate the opinion
> substantially outweighs their prejudicial effect.[10]

Fed. R. Evid. 703.  The court, however, has not seen Winters' expert report and cannot, without

more information, determine whether Winters may testify as to the cost estimates gathered by Cook.

The court is not aware of his proposed testimony or in what capacity he will be offered as an expert.[11]

It is unclear whether these cost estimates are regularly relied on by experts in Winters' field.[12]  It is

also unclear whether Winters has formed an opinion based on the cost estimates gathered by Cook

and other information, or whether Plaintiff plans to use Winters as a mere conduit for the hearsay

of another.  *See Williams v. Ilinois*, __ S. Ct. __, 2012 WL 2202981 at *12 (June 18, 2012) ("Under

. . . the Federal Rules of Evidence, an expert may base an opinion on facts that are 'made known to

the expert at or before the hearing,' but such reliance does not constitute admissible evidence of this

---

[10]  The balancing test in the last sentence of Rule 703 was added by amendment in 2000.

[11]  Winters is an architectural engineer but his role in this case may have been a supervisory
or project management role.

[12]  Lauth and Earnhardt argue that the cost estimates cannot be regularly relied on by experts
in Winters' field because they were created for the purpose of litigation.  Dkt. No. 211 at 5 ("The
repair estimates are not something upon which experts 'regularly rely,' but are instead case specific
estimates.").  The court cannot determine whether the cost estimates are regularly relied upon in
Winters' field because the court does not know in what field Winters will be offered as an expert or
the circumstances surrounding the solicitation of the estimates.

underlying information."[13]); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (Rule 703 is "not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.").

Prior to Winters' testimony, it will be necessary for Plaintiff to establish that the cost estimates are based on Suter's recommended repair. Then, it will be necessary for the court to determine whether it is reasonable for Winters to rely on the cost estimates. If Winters is unable to provide the necessary testimony as to the reasonableness of the cost of the structural repairs as recommended by Suter, Plaintiff will be unable to meet its burden to establish structural repair damages through these witnesses.

Although the court has some doubt whether Plaintiff can meet its burden, Defendants have not demonstrated that Plaintiff cannot do so.[14] Lauth and Earnhardt's motion to exclude damages for structural repairs is, therefore, denied without prejudice.

---

[13] The United States Supreme Court explained that "disclosure of these facts or data to the jury is permitted if the value of disclosure 'substantially outweighs [any] prejudicial effect" but that the disclosure is "for the limited purpose of explaining the basis for [the expert's] opinion and not for the truth of the matter asserted." *Williams*, 2012 WL 2202981 at *12 n.2 (internal quotations omitted).

[14] As recently explained by the South Carolina Court of Appeals:
To recover damages, the evidence must enable the jury to determine the amount of damages with reasonable certainty or accuracy. *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981). However, "proof with mathematical certainty of the amount of loss or damage is not required." *Id.* The determination of damages may depend to some extent on the consideration of contingent events if a reasonable basis of computation is provided, allowing a reasonably close estimate of the loss. *Piggy Park Enter., Inc. v. Schofield,* 251 S.C. 385, 391 92, 162 S.E.2d 705, 708 (1968).
*Magnolia North Property Owners' Ass'n, Inc. v. Heritage Communities, Inc.*, 725 S.E.2d 112, 126 (S.C. Ct. App. 2012).

**II. Lauth and Earnhardt's Motion for Summary Judgment as to Plaintiff's Negligence and Gross Negligence Claims (Dkt. No. 117); MacTec's Motion for Summary Judgment as to Plaintiff's Negligence and Gross Negligence Claims (Dkt. No. 121)**

**Background.** Defendants Lauth and Earnhardt filed a motion for summary judgment as to Plaintiff's negligence and gross negligence claims.[15] Dkt. No. 117. Defendant Mactec also filed a motion for summary judgment as to Plaintiff's negligence and gross negligence claims.[16] Dkt. No. 121. Based on the arguments raised in Defendants' motions, the court informed Plaintiff that it had doubts whether Plaintiff could establish claims of negligence against Defendants. For these reasons, the court ordered Plaintiff, should it wish to pursue its negligence and gross negligence claims, to file a supplemental brief addressing (1) what duty each Defendant owed Plaintiff as a subsequent purchaser of commercial real estate, (2) how each Defendant breached its duty, (3) how a breach caused damages to Plaintiff, and (4) why the economic loss rule is not a bar to its negligence claim. Plaintiff filed its supplemental brief on May 21, 2012.[17] Dkt. No. 204. Lauth and Earnhardt filed

---

[15] The court previously denied summary judgment as to Plaintiff's claims for breach of express and implied warranties against Lauth and Earnhardt. Plaintiff has also stipulated to the dismissal of its claims for private action for public and private nuisance against Lauth and Earnhardt. *See* Dkt. No. 195 at 2.

[16] The court previously granted summary judgment as to Plaintiff's claims for breach of express and implied warranties against MacTec. Plaintiff has also stipulated to the dismissal of its claims for private action for public and private nuisance against Mactec. *See* Dkt. No. 195 at 2.

[17] In its supplemental brief, Plaintiff misstates the standard for summary judgment: "Applying South Carolina law, if Ross can present even a mere scintilla of evidence that the Defendants' owed it a duty, breached that duty, and that Ross suffered damages as a result of the breach, Defendants' motions for summary judgment should be denied." Dkt. No. 204 at 5 (quoting *Hancock v. Mid-South Mgmt. Co., Inc.*, 673 S.E.2d 801, 802-03 (S.C. 2009)). In fact, the very case cited by Defendant states that a mere scintilla of evidence is *not* enough to overcome a summary judgment challenge in federal court. *Hancock*, 673 S.E.2d 801, 802 ("The rule followed in the federal court system provides that 'a mere scintilla of evidence is not sufficient to withstand the

15

a response to Plaintiff's supplemental brief on June 11, 2012.  Dkt. No. 207.  MacTec also filed a

response on June 11, 2012.  Dkt. No. 208.  Plaintiff did not file a reply, which was due June 25,

2012.  The court addresses Plaintiff's negligence and gross negligence claims against Lauth and

Earnhardt first, and then addresses the same claims against MacTec.

**Summary Judgment Standard.**  Summary judgment should be granted if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  It is well established that summary judgment should be

granted "only when it is clear that there is no dispute concerning either the facts of the controversy

or the inferences to be drawn from those facts."  *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d

1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine

issue of material fact, and the court must view the evidence before it and the inferences to be drawn

therefrom in the light most favorable to the nonmoving party.  *United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1)     A party asserting that a fact cannot be or is genuinely disputed must support
the assertion by:

(A)    citing to particular parts of materials in the record, including
depositions, documents, electronically stored information, affidavits
or declarations, stipulations . . . , admissions, interrogatory answers
or other materials; or

(b)    showing that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot produce

---

challenge.'") (quoting *Rogers v. Norfolk Southern Corp.*,588 S.E.2d 87, 90 (2003)) (internal
quotation omitted).

16

admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

**Negligence.**    In order to establish a claim for negligence, a plaintiff must show: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the duty by a negligent act or omission; (3) the defendant's breach was an actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury or damages. *Doe v. Marion*, 645 S.E.2d 245, 250 (S.C. 2007).

**A. Lauth and Earnhardt.**    Plaintiff argues that Lauth and Earnhardt owed a "duty of due care" to Plaintiff as a foreseeably affected third party because Lauth and Earnhardt knew that "the Property was being developed for industrial use for some future third-party purchaser." Dkt. No. 204 at 6.  According to Plaintiff, Lauth and Earnhardt's duties "arise from obligations imposed on contractors by law to perform their duties in a reasonable and workmanlike manner, consistent with industry standard." *Id.* at 7.  As to the specific duties owed by Lauth and Earnhardt to Plaintiff, Plaintiff argues:

> . . . Defendants owed Ross a duty of "commensurate care" related to the work each of the Defendants performed on the Property.  Specifically, Lauth owed a duty to Ross to use due care, commensurate with industry standard, in developing the Property and in overseeing any subcontractor work, including the overall grading of the Property and the removal and/or placement of fill material.  Likewise, Earnhardt owed a duty to Ross to use due care, commensurate with industry standard, in grading the Property and in removing and/or placing any fill material on the Property.

*Id.* at 12.  Lauth and Earnhardt respond that Plaintiff fails to specify the industry standard of care as

17

to Lauth as a general contractor and Earnhardt as a grading subcontractor. Lauth and Earnhardt

argue that the only standard of care cited by Plaintiff is a geotechnical engineering standard of care

that soils should not contain more than 5% organic matter. Dkt. No. 207 at 5. They argue that Lauth

and Earnhardt "relied on MacTec's testing, observation and geotechnical expertise to determine soil

placement and suitability," and that Plaintiff has not provided any evidence of what more they were

required to do to comply with the "industry standard." *Id.* at 4.

As to the specific breach, Plaintiff argues:

> Both Lauth and Earnhardt breached their duties to Ross. Ross retained PSI, a geotechnical engineer, to investigate the suitability of the soils on the Property. PSI took 104 soil boring samples of various types. (PSI Reports of Nov. 22, 2010; Oct. 8, 2010; July 1, 2010 and July 8, 2009). Of the 104 soil samples, more than half of the samples contained evidence of organic matter, ranging from trace organics to industrial samples with such a high degree of organic matter that PSI was unable to perform lab testing.
>
> Thirteen samples were taken within the footprint of the building. (Suter Report, Nov. 22, 2010, p. 4-9). All thirteen borings were taken in filled areas. Ten of the thirteen borings contained significant buried organic matter in the fill. (Suter Report, Nov. 22, 2010, p. 4). Four of the ten borings contained multiple layers of organic matter. (Suter Report, Nov. 22, 2010, p. 4-9). Laboratory organic content tests indicated an organic content ranging from five percent to thirteen percent. (Suter Report, Nov. 22, 2010, p. 4-6). Soil with organic content over five percent on the higher limit is generally considered unsuitable soil to support structures. (Suter Report, Nov. 22, 2010, p. 7). Laboratory analysis of the thirteen borings taken within the building showed organic content ranging from five percent to thirteen percent. (Suter Report, Nov. 22, 2010, p. 4-6). Use of materials with organic content exceeding five percent violates the standard of care. (Suter Report, Nov. 22, 2010, p. 4-9).
>
> As the general contractor, Lauth was responsible for assuring that the entire project was built according to the plans and specifications and applicable codes and industry standards. (Taylor Dep. at p. 12). Lauth did not perform any construction services with Lauth employees. (Taylor Dep. at p. 15). The entire project was built by subcontractors.
>
> Lauth subcontracted the clearing and grading of the site to Earnhardt. Earnhardt sub-subcontracted the clearing and grading to MW. The site was heavily wooded when Lauth first came to the job. (Taylor Dep. at p. 13; Barker Dep. at p.16). The trees on the site were cut and hauled off by MW. (Taylor Dep. at p. 14).

18

MW removed the stumps and cleared the balance of the site. (Taylor Dep. at p. 13). The stumps, brush, etceteras [*sic*] were burned. (Taylor Dep. at p. 18).

MW contends that it did no grading or fill to balance the site. (Moorhead Dep., p.14-15). To the extent that fill was deposited in ravines or low areas, the fill was placed by Earnhardt. (Taylor Dep. at p. 14). To the extent the fill contained unacceptable levels of organic matter, the only conclusion that can be drawn is that it was placed by Earnhardt under Lauth's supervision and MacTec's inspection.

While both Lauth and Earnhardt deny that the fill used on the site contained any organic matter, the circumstantial evidence leads to the conclusion with reasonable certainty that Earnhardt placed the fill on the site. If there is organic matter in the fill that exceeds five percent, which there is evidence that there is, the fill is unsuitable and to allow it to be placed on the Property and/or to fail to properly oversee the Project in such a way as to ensure its removal constitutes a breach of industry standard. Consequently, the presence of unsuitable fill on the Property violates Earnhardt's and Lauth's duty of care to Ross.

Dkt. No. 204 at 12-14.[18] Lauth and Earnhardt respond that Plaintiff is relying on *res ipsa loquitur*, and that "Ross continues to ignore that there are other plausible explanations for organic material on site and, more importantly, that there are multiple parties all of whom may or may not be responsible in varying degrees." Dkt. No. 207 at 6.

The court agrees that Plaintiff has not established a standard of care or breach of the standard of care by Lauth and Earnhardt. The only standard of care cited by Plaintiff is the standard of care for a geotechnical engineer, not a general contractor or grading subcontractor. Plaintiff has identified no expert testimony to establish what level of care Lauth and Earnhardt should have exercised with respect to their contractual duties. Further, Plaintiff has identified no expert testimony that

___

[18] In its Response to Lauth and Earnhardt's motion for summary judgment, Plaintiff argued that it met its burden of establishing a duty of care through an industry standard articulated by Plaintiff's expert, Karl Suter. Dkt. No. 143 at 11. Suter opines in his report that "[t]he standard of care in geotechnical engineering practice is that soils with organic contents greater than about 3 percent on the lower limit to 5 percent on the higher limit are generally considered unsuitable materials to support structures, pavements, and to be used as embankment fill." Dkt. 143-13 at 57. Plaintiff also argued that it established a breach of that duty of care based on Bryan Lucas's expert testimony that "the presence of organic matter in the fill material was the result of the failure to remove the existing topsoil layer and placing fill in low areas on the site." Dkt. No. 143 at 11.

19

establishes Lauth and Earnhardt breached their duties. The court concludes that Plaintiff has not identified sufficient evidence to support its claim for negligence against Lauth and Earnhardt. The court, therefore, grants Lauth and Earnhardt's motion for summary judgment as to Plaintiff's negligence claims.

**B. MacTec.** Plaintiff has provided evidence of the industry standard of care for geotechnical engineers as to the acceptable amount of organic material in soil supporting structures. The issue concerning Plaintiff's negligence claim against MacTec is whether MacTec owed a duty of care to Plaintiff.

In a professional negligence case, a plaintiff must establish that there is a duty that arises outside of a contract. *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995) ("A breach of a duty arising independently of any contract duties between the parties, however, may support a tort action."). Often, this duty arises out of a special relationship between the tortfeasor and the injured party. *Id.* ("When, however, there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action.") (citing *South Carolina State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324 (S.C. 1986)).

MacTec argues that it had no legal duty to Plaintiff to support a negligence claim because there was no special relationship between MacTec and Plaintiff. Dkt. No. 121-1 at 4-7. Although "South Carolina Courts have recognized that under certain circumstances, a relationship may exist between professionals and third parties with whom they are not in privity of contract which creates a legal duty separate and distinct from any contractual duties," *id.* at 5, MacTec argues that there is no relationship between MacTec and Plaintiff. *Id.* at 6-7. Plaintiff responds that lack of privity is

20

no defense to a negligence claim and that Plaintiff was a foreseeably affected third party as a subsequent purchaser. Dkt. No. 140 at 9-10. Plaintiff argues that "South Carolina Courts have repeatedly held that professionals like MacTec owe a duty of care to third parties who might be harmed by the professional's negligent conduct, even in the absence of contractual privity." Dkt. No. 140 at 9. Plaintiff relies on five cases to establish a duty running from MacTec to Plaintiff based on a special relationship between the parties or the extension of duties to a foreseeably affected party: *Georgetown Steel Corp. v. Law Engineering Testing Co.*, 7 F.3d 223 (Table), 1993 WL 358770 (4th Cir. 1993); *Cullum Mechanical Construction, Inc. v. South Carolina Baptist Hosp.*, 544 S.E.2d 838 (S.C. 2001); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85 (S.C. 1995); *Kennedy v. Columbia Lumber and Manufacturing Co., Inc.*, 384 S.E.2d 730 (S.C. 1989); and *South Carolina State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324 (S.C. 1986).

The court finds that Plaintiff has not established a special relationship between MacTec and Plaintiff creating a legal duty from MacTec, as a geotechnical engineer hired by a general contractor to complete soil analysis on property for a developer, to Plaintiff, as a subsequent commercial purchaser of the property. Plaintiff has alleged no relationship between MacTec and Plaintiff. Further, none of the cases cited by Plaintiffs show that MacTec owed a duty of care to Plaintiff in absence of a relationship.

Although *Tommy Griffin* involved a negligence claim against an engineer, the duty that arose to the contractor by the engineer was based on a working relationship between the parties. 463 S.E.2d at 88 (concluding that engineer that designed and supervised construction project "owed a duty to the contractor not to negligently design or negligently supervise the project"). Similarly, in

21

*Cullum*, there was an allegation of contract provisions that may have created a special relationship between the parties. 544 S.E.2d at 840 (finding factual issue existed as to whether there was a special relationship between architect and subcontractor that gave rise to duty because of allegations that contract required architect to supervise payments to subcontractors). Here, there is no allegation of a contract provision that created a relationship between MacTec and Plaintiff. *Booz-Allen* is also distinguishable because the duty to use due care in that case ran "from a consultant to the commercial competitor who is being criticized." 346 S.E.2d at 326 (holding "a duty to use due care, running from a consultant to the commercial competitor who is being critiqued, arises when the consultant undertakes to objectively analyze and compare the attributes of commercial competitors for the purpose of giving one a market advantage over the other.").[19] The court finds that *Kennedy* is not applicable in the commercial context and is a discussion of an exception to the economic loss rule, not an exception to the requirement that parties in a negligence action must have a special relationship to impose a legal duty. 384 S.E.2d at 737 (holding that a new home buyer can bring a negligence claim against builder when builder violated a legal duty). *See also Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49 (S.C. 2009) (explaining that *Kennedy* carved out a narrow exception to economic loss rule for homeowners only).

---

[19] In *Booz-Allen*, the Georgia Ports Authority contracted with consulting firm Booz-Allen to prepare a report. 346 S.E.2d at 325. The report, when completed, contained false data concerning the Charleston, South Carolina port. *Id.* The South Carolina Ports Authority and other associations affected by the decrease in port traffic, which allegedly resulted from the report, filed suit against Booz-Allen for negligence. *Id.* Plaintiffs argued that Booz-Allen should have known that plaintiffs would have been negatively impacted by the false report, and Booz-Allen, therefore, owed them a duty of care. *Id.* The court noted that "[f]oreseeability itself does not give rise to a duty," but that a "tort-feasor's duty arises from his relationship to the injured party," which "may arise out of the tort-feasor's contractual relationship with a third party." *Id.*

Although *Georgetown Steel* is somewhat factually similar to this case,[20] the court finds that the relationships between the parties in that case were quite different. Carbide and Law Engineering had a relationship and communicated about Carbide's needs with respect to fill material. 1993 WL 358770, at *1. Law Engineering had received Carbide's plant designs and plans. *Id.* Law Engineering could not only foresee, but in fact knew, that Carbide would be damaged by any failure related to the slag, because Law Engineering knew that Carbide was the intended occupant of the plant built on the slag. *See id.* at *3 n.4 ("Carbide insisted that Georgetown obtain competent soil engineering services, Georgetown hired Law to discharge its obligation to Carbide, and Law plainly 'recognized' that it was rendering these services for Carbide's protection.").

Further, the court declines to rely on *Georgetown Steel* to the extent Plaintiff argues that the Fourth Circuit found a duty of care running from Law Engineering to Carbide based only on foreseeability of use by a third party. In *Georgetown Steel*, the court explained that "a party that undertakes to perform a contract assumes a duty of due care to foreseeably affected third parties." 1993 WL 35877 at *3 (citing *Terlinde v. Neely*, 271 S.E.2d 768, 770 (S.C. 1980) ("The key inquiry is foreseeability, not privity. In our mobile society, it is clearly foreseeable that more than the original purchaser will seek to enjoy the fruits of the builder's efforts. The plaintiffs, being a member of the class for which the home was constructed, are entitled to a duty of care in construction commensurate with industry standards.")). In *Terlinde*, a subsequent home buyer

---

[20] Georgetown Steel operated a steel mill and entered into a contract to bring a supplier, Carbide, on site. 1993 WL 358770, at *1. In the Georgetown/Carbide contract, Georgetown was responsible for securing soil analysis and preparing the site of the Carbide plant, and it contracted with Law Engineering to prepare the soil. Law Engineering discussed with Carbide its specific needs with respect to the soil. The soil was defective, which caused damage to the Carbide plant. Carbide brought, *inter alia*, a negligence claim against Law Engineering.

23

brought a negligence claim against the builder of the house, which was built for speculative sale. 271 S.E.2d at 768. As explained by the South Carolina Supreme Court in 2007, the decision to impose liability in *Terlinde* was based on several policy reasons:

> In *Terlinde*, which addressed the duty of a homebuilder to future homeowners, the Court articulated several public policy considerations upon which it's [*sic*] opinion was based; specifically, that the ordinary buyer was not in a position to discover latent defects in a structure, and that the lapse of time before which latent defects manifest themselves created unequal bargaining positions between the subsequent purchaser and the builder. 275 S.C. at 397-98, 271 S.E.2d at 769.

*McCullough v. Goodrich & Pennington Mort. Fund, Inc.*, 644 S.E.2d 43, 47 (S.C. 2007). The court finds that *Terlinde* was intended to protect homeowners, not subsequent purchasers of commercial real estate. *See also Sapp*, 687 S.E.2d at 50 n.2 (citing *Terlinde* as an example of the long line of cases "protecting consumers only in the residential home building context").

Plaintiff argues that builders, contractors, and subcontractors are liable for any deviation from industry standard to subsequent purchasers of commercial real estate because it is foreseeable that commercial real estate may be sold and that any defect based on deviation from an industry standard will be inherited by the subsequent purchaser. Plaintiff has presented no case imposing tort liability on either a builder, contractor, or subcontractor in the context of a subsequent purchaser of commercial real estate, and has failed to convince the court that South Carolina would impose liability in this context.[21] Unlike the homeowner in *Terlinde*, Plaintiff is a sophisticated commercial party. In light of these circumstances, and in the absence of any special relationship or personal

---

[21] "South Carolina law recognizes reasonable limitations on tort liability in negligence actions where the plaintiffs have suffered no personal injury and have no direct relationship with the tortfeasor." *Sanders v. Norfolk Southern Railway Co.*, 400 Fed. Appx. 726, 2010 WL 4386881, at *2 (4th Cir. 2010) (citing Hubbard & Felix, The South Carolina Law of Torts, 49 (3d Edition 2004)).

injury, the court finds that there is no legal duty between MacTec and Plaintiff to support a negligence claim.[22]

**Gross Negligence.**  Plaintiff's claims for gross negligence against Lauth, Earnhardt, and MacTec fail because Plaintiff cannot establish a claim for negligence against them.

## CONCLUSION

For the reasons stated above, the court denies Lauth and Earnhardt's motion to exclude structural repair damages (Dkt. No. 119).  The court grants Lauth and Earnhardt's motion for summary judgment as to Ross's negligence and gross negligence claims (Dkt. No. 117), and grants MacTec's motion for summary judgment as to Ross's negligence and gross negligence claims (Dkt. No. 121).

Plaintiff's claims for breach of implied and express warranties against Lauth and Earnhardt will proceed to trial, which is scheduled for September 6-19, 2012.  Although this order dismisses all claims by Plaintiff against MacTec, MacTec is still a party in this action based on the cross-claim filed by Lauth (Dkt. No. 82).

**IT IS SO ORDERED.**

S/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 2, 2012

---

[22]  Lauth and MacTec asserted the economic loss rule as an affirmative defense but did not address it in their opening briefs.  Although the court requested that Plaintiff brief this issue in its supplemental brief, the court need not address this issue because Plaintiff has failed to establish a negligence claim against any Defendant.